UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| BRIAN S. RUSSELL<br>　　Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br>Acting Commissioner,<br>Social Security Administration,<br>　　Defendant. | Civil Action No. 5:14-cv-00045<br><br>**MEMORANDUM OPINION**<br><br>By:　Joel C. Hoppe<br>United States Magistrate Judge |

　　Plaintiff Brian S. Russell asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–34, 1381–1383f. The case is before me by the parties' consent under 28 U.S.C. § 636(c)(1). Having considered the administrative record, the parties' briefs and oral argument, and the applicable law, I find that the Commissioner's final decision is not supported by substantial evidence in the record. The decision is reversed and the case remanded under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

　　The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a) (governing claims for DIB), 416.905(a) (governing adult claims for SSI). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5)

whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The claimant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

II. Procedural History

Russell filed for DIB and SSI on June 8, 2011. *See* Administrative Record ("R.") 53, 66. He was 36 years old, R. 53, and had worked most recently as a disassembler at an auto parts shop. R. 199. Russell alleged disability beginning on February 1, 2001, because of scoliosis, herniated discs in his neck and lower back, and Attention Deficit Disorder. R. 168, 178, 224. He met the DIB insured-status requirements through March 31, 2011. R. 84. After a state agency twice denied his applications, R. 65, 98, Russell appeared with counsel at an administrative hearing on May 15, 2013. R. 27. At the hearing, Russell amended his alleged disability onset date to January 1, 2011. R. 30. He testified about his mental and physical conditions and the limitations they placed upon his daily activities. R. 31–45. A vocational expert ("VE") also testified about the nature of Russell's past work and his ability to perform other jobs in the national and local economy. R. 45–51.

The ALJ denied Russell's application in a written decision dated June 21, 2013. R. 13–23. He found that Russell had severe impairments of degenerative disc disease in his lumbar, cervical, and thoracic spine. R. 15. He determined that these impairments, alone and in combination, did not meet or equal a listing. R. 17. The ALJ next determined that Russell had the residual functional capacity ("RFC") to perform light work with some postural restrictions.[1] *Id.*

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking

3

Relying on the VE's testimony, the ALJ concluded at step four that Russell could return to his past relevant work as an artisan. R. 22. As an alternative finding, the ALJ determined that Russell can perform other jobs that exist in significant numbers in the economy, such as security guard, hand packer, and retail sales clerk. R. 22–23. He therefore determined that Russell was not disabled under the Act. R. 23. The Appeals Council declined to review that decision, R. 1, and this appeal followed.

III. Relevant Medical Evidence

*A.     Treatment Notes*

Russell's medical records indicate that he has a long history of degenerative disc disease in the lumbar, thoracic, and cervical spine, *see, e.g.*, R. 316, 320, 325–28, 356, 429, 498, 529, 543, 607, 612, that has worsened since 2004, *see* R. 664, 650, 705.

An MRI of Russell's cervical and thoracic spine taken on September 21, 2010, showed degenerative disc disease at C5-C6 and C6-C7, but no evidence of vertebral body fracture or malalignment. R. 664. The reviewing radiologists opined that Russell had mild to moderate central canal stenosis[2] at C6-C7, minimal multilevel degenerative disc disease at the mid-thoracic spine, and posterior bulge and superimposed annular tear at T11-T12 causing minimal central canal narrowing. R. 665.

On October 14, 2010, Russell visited UVA Hospital East for a follow-up appointment and reported that lying flat, bending his neck, and holding extra weight made his pain worse. R.

---

or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

[2]"Spinal stenosis is a narrowing of the open spaces within your spine, which can put pressure on your spinal cord and the nerves that travel through the spine. Spinal stenosis occurs most often in the neck and lower back." Mayo Clinic, *Spinal Stenosis: Definition*, June 12, 2015, http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105.

484. He told Lara Myers, N.P., that "physical therapy had worked for him in the past," he was currently looking for a physical therapy facility, and he was "not interested in pursuing invasive techniques of treatment." *Id.*

In March 2011, Russell began treatment at Middlebrook Family Medicine ("Middlebrook"). R. 784. Russell was seen by Kenneth Perkins, P.A., and Cindy Almarode, N.P., during most of these visits, *see* R. 649–62, 675–702, 732–43, 746–83, but both operated under the supervision of John Marsh, M.D., *see, e.g.*, R. 744 (treatment note from Dr. Marsh), 741–42 (treatment note from Nurse Almarode co-signed by Dr. Marsh).

On March 24, 2011, Russell told Mr. Perkins that he had chronic cervical, thoracic, and lumbar spine pain that had recently started to radiate down his left hip and leg. R. 604. On examination, he had tenderness throughout his spine, with more tenderness at L4-L5 on the left side than the right. *Id.* He had left-side pain on a straight leg raise test at 20 degrees, and his left leg had decreased quadriceps strength and foot extension compared to his right. *Id.* Mr. Perkins found no abnormalities in Russell's prior films and requested an MRI. *Id.* Mr. Perkins prescribed Vicodin, Valium, and a steroid dose pack. *Id.*

An MRI of Russell's lumbar spine taken on March 30, 2011, showed mild multilevel endplate degenerative changes and facet arthropathy, but no significant stenosis. R. 716. Mr. Perkins reviewed this MRI, and noted mild disc disease and degenerative changes that were not as significant as those in Russell's thoracic and cervical spine. R. 701. Russell reported that the steroid pack had "significantly improved his symptoms." *Id.* On examination, Russell had a negative straight leg raise test, tenderness at L4-L5, and tenderness in his thoracic and cervical spine with decreased range of motion. *Id.* Mr. Perkins referred him to UVA neurosurgery. *Id.*

5

On May 11, 2011, Russell saw Gregory Helm, M.D., PhD., a neurologist at UVA Hospital East. R. 483. On examination, he had good strength and sensation in his upper and lower extremities and no signs of spinal cord pathology. *Id.* Dr. Helm reviewed Russell's cervical and lumbar MRIs and found some mild degenerative changes, but no obvious surgical lesions. *Id.* Dr. Helm recommended physical therapy. *Id.*

Russell returned to Middlebrook on May 17, 2011. R. 700. He reported continued pain as well as increased pain that occurred at the end of his workdays and restricted his range of motion. *Id.* On examination, Russell was tender in the mid-thoracic region, at L4-L5, and at C5-C6. *Id.* Noting that Dr. Helm had determined Russell was not a candidate for surgery, Mr. Perkins recommended that Russell engage in physical therapy and minimize the use of narcotic medication. *Id.*

On June 8, 2011, Russell informed Mr. Perkins that he had lost his job because the new owner refused to accommodate his limitation in heavy lifting. *See* R. 699. He stated that his medications controlled his pain and that he slept well most nights, depending on his level of activity. *Id.* Russell was tender around his cervical, thoracic, and lumbar spine. *Id.* He displayed significant scoliosis, but had intact muscle strength in both lower extremities. *Id.*

On June 28, 2011, Mr. Perkins examined Russell and noted lumbar tenderness and significant spasm of his thoracic and cervical region, primarily at the right paravertebral muscles. R. 596. Russell's neurological exam was intact. *Id.* Mr. Perkins stated that Russell could benefit from an antidepressant and prescribed Pristiq. *Id.* On August 4, 2011, Mr. Perkins found Russell tender to palpation in the T5-T6 region and from L3 through S1. R. 662. He also had pain during a left straight leg raise test at 30 degrees. *Id.* Mr. Perkins continued his medications as prescribed. *Id.*

On August 23, 2011, Mr. Perkins examined Russell and completed a Disability Determination Services Range of Motion Form. R. 591–93, 661. He noted that Russell had reduced range of motion in his cervical and thoracolumbar spine, "moderate but not normal" strength in his lower and upper extremities, and a moderately abnormal gait. R. 591–93. He was also tender throughout the spine, notably at L4-L5. R. 661.

Nurse Almarode examined Russell on October 11, 2011. R. 656–58. Russell reported doing "fairly well" and was tender to palpation in his thoracic and lumbar spine. R. 656–57. Nurse Almarode assessed his disc degeneration and displacement as stable. R. 657.

Two weeks later, Russell complained of increased cervical pain, but did not report related trauma. R. 654. Mr. Perkins found neck tenderness, limited range of motion, and pain with range of motion in Russell's cervical and lumbar spine. R. 655. Mr. Perkins assessed worsening degeneration of the cervical intervertebral discs, ordered X-rays, and prescribed additional pain medication and a cervical collar. *Id.* Mr. Perkins made similar examination findings on November 16, 2011. R. 652–53. He diagnosed worsening degeneration of the discs in Russell's cervical, thoracic, and lumbar spine and referred him to pain management. R. 653. X-rays taken of Russell's cervical spine the same day showed degenerative disc space narrowing and anterior and posterior bony ridging at the C6-C7 level. R. 705.

At a follow-up appointment on December 15, 2011, Mr. Perkins noted pain with range of motion and limited range of motion in Russell's thoracic and lumbar spine, but made no abnormal findings concerning his cervical spine. R. 649–50. On January 17, 2012, Russell had limited range of motion and pain with range of motion in his cervical and lumbar spine, with no abnormal findings in his thoracic spine. R. 684–85. At both visits, Mr. Perkins assessed Russell's conditions as stable and made no changes to his medication. R. 650, 685.

An MRI of Russell's cervical spine taken on February 7, 2012, displayed a moderate size broad-based central disc herniation at C6-C7 with mild cord compression and a mild diffuse disc bulge at C5-C6. R. 703–04. No significant abnormalities were identified at C7-T1 through the T2-T3 disc levels. R. 703.

Over the following year, Russell returned to Middlebrook twenty times. *See* R. 675–83, 732–88. Though four of these visits were for sinus issues, *see* R. 735, 750, 753, 763, the majority were follow-up appointments for Russell's spinal conditions. Russell continuously displayed limited range of motion and pain with range of motion in his lumbar and cervical spine. R. 676, 678, 680, 739, 748, 754, 758, 762, 768, 771, 775, 779, 783. He also had limited range of motion and pain with range of motion in his thoracic spine four times. R. 771, 758, 754, 748. His spinal conditions were described as worsening four times, R. 683 (February 22, 2012), 736 (December 27, 2012), 755 (February 11, 2013), and as stable three times, R. 771 (August 29, 2012), 739 (October 11, 2012), 732 (January 17, 2013), 759 (January 29, 2013). Russell was treated during this time with medication, including a fentanyl patch that worked with varying efficacy. *See, e.g.*, R. 773 (patch reported to be less effective on August 1, 2012), R. 768 (improved pain control on patch reported on February 8, 2012).

Russell saw Dr. Marsh once, on October 3, 2012, when Dr. Marsh refilled his prescriptions, but did not record a physical examination. R. 744–45. Russell saw Nurse Almarode four times, *see* R. 732, 735, 738, 741, and at all other visits saw Mr. Perkins. Dr. Marsh co-signed nearly every treatment note after June 6, 2012. *See* R. 737, 740, 752 755, 759, 762, 765, 768, 772, 775, 779, 783.

8

*B.     Medical Opinions*

State-agency examiner R. S. Kadian, M.D., reviewed Russell's record on October 13, 2011. R. 72–75. Dr. Kadian opined that Russell could occasionally lift 20 pounds and frequently lift 10 pounds; stand or walk for four hours and sit for six hours in an eight-hour workday; occasionally crawl, crouch, and kneel; and occasionally climb ramps, stairs, ladders, ropes, and scaffolds. R. 73. Dr. Kadian also determined that Russell had no limitations in pushing or pulling and did not need to avoid any environmental hazards. R. 73–74. A second state-agency examiner, Tony Constant, M.D., reviewed Russell's record on February 9, 2012. R. 85–87. He concurred with Dr. Kadian's assessment except that he found that Russell should not climb ladders, ropes, or scaffolds. R. 85.

Mr. Perkins completed a Physical Residual Functional Capacity Questionnaire on May 6, 2012. R. 784–86. He diagnosed Russell with degenerative joint disease; degenerative disc disease of the lumbar, thoracic, and cervical spine; severe scoliosis; and depression secondary to chronic pain. R. 784. In support of his opinion, Mr. Perkins referenced diagnostic findings of scoliosis, herniated and bulging discs, cord compression, annual tear, stenosis, and disc desiccation. *Id.* He also noted that Russell had an abnormal gait, muscle spasms, and decreased muscle strength bilaterally in his biceps, triceps, quadriceps, and calves. *Id.* He opined that because Russell "had been on long term narcotic treatment, those narcotic medications alter his decision making process [and] make him drowsy, unsteady on his feet, and nauseous." *Id.*

Mr. Perkins opined that Russell could walk less than one block without resting or experiencing severe pain and could sit 10 minutes at a time, stand five minutes at a time, and sit or walk for less than two hours total in an eight-hour day. *Id.* Russell needed to constantly shift positions, including lying down, and would need to take several unscheduled breaks during a

9

workday. *Id.* Russell required an assistive device to stand or walk and could rarely lift 10 pounds and never lift more than that. *Id*. He could use his hands for fine manipulation and grasping, turning, or twisting objects for five percent of an eight-hour workday and could never reach over his head. *Id.* Russell should never twist, stoop, crouch, or climb stairs. *Id.* Dr. Marsh also signed the form above a stamp bearing his name. R. 785.

On May 13, 2013, Dr. Marsh completed a Medical Interrogatory related to the above opinion that asked if Russell's conditions were "the same or worse since Kenneth Perkins, N.P., [sic] completed the attached form dated 5/6/2012." R. 786. Dr. Marsh opined that Russell's condition had not significantly changed, though he had experienced flare-ups. *Id.*

IV. Discussion

Russell argues that the ALJ erred in rejecting his treating physician's opinion and adopting the opinions of Dr. Kadian and Dr. Constant (the "DDS physicians"). *See generally* Pl. Br. 5–9. He asserts that the ALJ should have given deference to Dr. Marsh's opinion and failed to explain the weight he gave that opinion and the reasons for that weight. *Id.* at 7–8. The Commissioner counters that Dr. Marsh examined Russell only once and that the medical professionals who regularly examined Russell, physician assistant Perkins and Nurse Almarode, are not acceptable medical sources. Def. Br. 7, n.1. This argument implicitly questions whether Dr. Marsh was a treating source whose opinion could be entitled to controlling weight.

A.   *Medical-Source Opinions*

ALJs must weigh each "medical opinion" in the claimant's record. 20 C.F.R. §§ 404.1527(c), 416.927(c). Medical opinions are statements from "acceptable medical sources," such as physicians, that reflect judgments about the nature and severity of the claimant's impairment, including his symptoms, diagnosis and prognosis, and functional abilities and

10

limitations.[3] 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations classify medical opinions by their source: those from treating sources and those from non-treating sources, such as examining physicians and state-agency medical consultants. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c).

A treating-source medical opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the ALJ finds that a treating-source medical opinion is not entitled to controlling weight, he then must weigh the opinion considering the source's specialty, the source's familiarity with the claimant, the weight of the evidence supporting the opinion, and the opinion's consistency with other evidence in the record. *Burch v. Apfel*, 9 F. App'x 255, 259 (4th Cir. 2001) (per curiam); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ must consider the same factors when weighing medical opinions from non-treating sources. 20 C.F.R. §§ 404.1527(c), 404.1527(e)(2), 416.927(c), 416.927(e)(2).

The ALJ must explain the weight given to all medical opinions, *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013), and he must give "good reasons" for the weight assigned to any treating-source medical opinion, 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Mastro*, 270 F.3d at 178 (the ALJ may reject a treating-source medical opinion "in the face of persuasive

---

[3] They are distinct from medical-source opinions on issues reserved to the Commissioner, such as the claimant's RFC or whether he is "unable to work." 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1). The ALJ must consider these opinions as he would any relevant evidence, but he need not accord "any special significance" to the source's medical qualifications. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Morgan v. Barnhart*, 142 F. App'x 716, 722 (4th Cir. 2005). The ALJ is not free . . . simply to ignore a treating physician's legal conclusions, but must instead 'evaluate all the evidence in the case record to determine the extent to which [the conclusions are] supported by the record.'" (quoting SSR 96-5p, 1996 WL 374183, at *3 (July 2, 1996)).

11

contrary evidence[,]" but only if he gives "specific and legitimate reasons" for doing so). His "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight.'" *Id.* (quoting SSR 96-8p, at *5)).

Non-acceptable medical sources, such as physician assistants, cannot give "medical opinions" about the claimant's condition, *see Ward v. Chater*, 924 F. Supp. 53, 56 (W.D. Va. 1996); 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1), but they can provide valuable information about the claimant's medical condition and functional limitations, and the ALJ must consider that information as he would any relevant evidence, *Adkins v. Colvin*, No. 4:13cv24, 2014 WL 3734331, at *3 (W.D. Va. July 28, 2014). The ALJ may consider opinions from non-acceptable medical sources as he would opinions from acceptable medical sources, and he should do so when the source "had a lengthy relationship with the claimant." *Id.* at *3 n.6. But non-acceptable medical sources are not "treating" sources, and their opinions are not entitled to special deference under the regulations. *See id.* at *3; 20 C.F.R. §§ 404.1527, 416.927.

B.   *The ALJ's Findings*

The ALJ provided two reasons for rejecting the opinions signed by Dr. Marsh and Mr. Perkins. First, he rejected them as conclusory and "on an issue reserved for the Commissioner." R. 21. Second, they were "not supported by the longitudinal record with its limited physical findings, and generally routine and conservative treatment, including their own treatment notes." *Id*. He also "generally adopted" the DDS physicians' assessments "because they [were] consistent with the other credible evidence of record" and none of the evidence added to the record after their opinions "provide[s] any new or material information that would alter any findings about [Russell's] residual functional capacity." R. 21.

C.  *Analysis*

To apply the proper standard to Dr. Marsh's opinion, I must determine whether he was a treating physician. The Commissioner contends, at least implicitly, that he is not. Her argument, however, does not consider the relationship between a physician and his or her physician assistant. Courts have recognized that physician assistants typically work under the supervision of a physician and that the supervising physician adopts their records, diagnoses, and prognoses if he or she signs the records. *See generally Alexander v. Colvin*, No. 9:14-2194, 2015 WL 2399846, at *6 (D.S.C. May 19, 2015); *Johnston v. Colvin*, No. 7:12cv617, 2014 WL 534080, at *8 (W.D. Va. Feb. 12, 2014) (explaining that the realities of today's healthcare system often demand an arrangement where physician assistants and nurse practitioners attend to patients instead of physicians).

During all but one of Russell's visits to Middlebrook, Mr. Perkins or Nurse Almarode examined Russell. *See* R. 649–62, 675–702, 732–43, 746–83. Dr. Marsh is listed as the provider of service only once, on October 3, 2012, and he did not conduct a physical examination of Russell. *See* R. 744–45. Nevertheless, Dr. Marsh reviewed many other treatment notes and adopted them with his signature on the date of service. *See* R. 737, 740, 752 755, 759, 762, 765, 768, 772, 775, 779, 783. He also adopted Mr. Perkins's opinion of Russell's functional abilities when he signed the RFC assessment questionnaire, R. 785, and opined on May 13, 2013, that Russell's medical conditions were the same or worse than the previous assessment, R.786–88. Considering the nature of the working relationship between a physician and his physician assistant and his documented review of Russell's treatment notes over an extensive period, Dr. Marsh will be considered a treating physician. Having made this threshold determination, I turn to the substance of Dr. Marsh's opinion.

An ALJ may reject a treating-source medical opinion "in the face of persuasive contrary evidence" if he gives "specific and legitimate reasons" for doing so. *Mastro*, 270 F.3d at 178. The ALJ fully rejected Dr. Marsh's opinion, giving it no weight. R. 21. He provided two reasons. First, he explained that Dr. Marsh opined on an issue reserved to the Commissioner by stating that Russell was "unable to work." *Id.* A review of the record, however, conclusively establishes that Dr. Marsh did not make this statement or opine on Russell's overall ability to work. *See* 784–86. Rather, Dr. Marsh's opinion discussed Russell's specific functional abilities and limitations, *see id.*, a subject that is within the purview of a treating physician under the regulations. 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2). The ALJ's first reason, thus, lacks support.

Second, the ALJ found that Dr. Marsh's opinions were "not supported by the longitudinal record with its limited physical findings and generally routine and conservative treatment, including [Dr. Marsh and Mr. Perkins's] own treatment notes." R. 21. Though this reason is conclusory, it references more a thorough analysis provided earlier on the same page of the ALJ's decision:

> The longitudinal record is relatively unremarkable. The claimant had sporadic positive leg raise, but generally examinations showed only some decreased range of motion and tenderness. The claimant had decreased strength at two visits in March and August, but he had good strength in May and June 2011 and there are no other findings of decreased strength, sensation, or reflexes. None of the x-ray, MRI or other imagery evidence provides objective support for an impairment that could reasonably produce the extent or intensity of the claimant's expression of subjective pain. The claimant's treatment has been generally routine, conservative and unremarkable – no surgery has been recommended, the claimant has not completed a course of physical therapy, and there has not been ongoing treatment by an orthopedic, neurology, or pain management specialist.

*Id.* This analysis marshals the evidence from the record in support of the ALJ's second reason for rejecting Dr. Marsh's opinions. Though it is not perfect or extensive, this analysis provides a

14

sufficiently clear and legitimate reason for the ALJ's decision, and it is supported by substantial evidence.

Russell's physical examinations were consistently mild, with the predominant findings being tenderness, limited range of motion, and pain on range of motion throughout Russell's cervical, thoracic, and lumbar spine. *See, e.g.*, R. 655, 700, 701, 739, 768, 783. Abnormal findings were few and sporadic: in more than two years of relevant medical records, he displayed muscle spasm once, R. 596, decreased strength twice, R. 591–93, 604, and pain on a straight leg raise test only twice, R. 604, 662; *see also* R. 701 (negative straight leg raise test). Many more treatment notes indicate full strength or no abnormalities in strength, sensation, or reflexes. *See, e.g.*, R. 483, 656, 699, 701, 771, 732, 759. The ALJ also properly noted that the record contained no examinations or testing that supported restrictions in manipulation. R. 21. The absence of such evidence undermines the validity of Dr. Marsh's opinion.

Russell's treatment has been conservative, consisting almost exclusively of medication. *See, e.g.*, R. 701 (steroids "significantly improved his symptoms"), 768 (improved pain control on a fentanyl patch). In 2011, Dr. Helm determined that Russell was not a good candidate for surgery. R. 483. He was repeatedly encouraged to engage in physical therapy, R. 483, 700, but did not attend his appointments despite reporting that it had helped in the past, R. 484. Russell's last two years of treatment before the ALJ's decision consisted solely of prescriptions for pain medication. *See, e.g.*, R. 676, 739, 748, 758, 768, 775, 783.

The record's diagnostic findings present a closer question. Although most of the X-rays and MRIs in the record show mild findings, the February 2012 MRI presented evidence of mild cord compression at C6-C7. R. 703–04. The ALJ summarizes this record in his recitation of the medical evidence, R. 20, but he does not address it in connection with his conclusion that none of

15

the imaging provides objective support for Russell's complaints of pain, *see* R. 21. Because the ALJ's other justifications for rejecting Dr. Marsh's opinion are well supported by the record, I cannot find that this omission alone defeats the ALJ's determination.

The ALJ thoroughly reviewed the medical evidence and Russell's statements. R. 18–21. He then analyzed this evidence and questioned the extent of Russell's claimed limitations. R. 21. Although the ALJ's one-sentence discussion of Dr. Marsh's opinion was flawed and conclusory, I must read it in conjunction with the entirety of his review and analysis of the record. *See McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (per curiam) ("[T]he ALJ need only review medical evidence once in his decision."). This overall discussion provided "specific and legitimate" reasons to reject a treating-source medical opinion, and those reasons are supported by substantial evidence in the record.[4] *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 67 (4th Cir. 2014) (per curiam).

The ALJ did not, however, provide sufficient support for generally adopting the opinions of Dr. Kadian and Dr. Constant, from which he derived Russell's RFC. He stated simply that he "adopted the DDS assessments . . . because they [were] consistent with other credible evidence of the record." R. 21. There are two problems with the ALJ's general adoption of the DDS physicians' RFC. First, he failed to explain how the opinions were consistent with other evidence. While his analysis of the record, *id.*, provided an adequate rebuttal to Russell's allegations and Dr. Marsh's opinion of his disabling limitations, it sheds little light on why he adopted the DDS physicians' opinions or how he determined Russell's RFC. The only functional findings the ALJ specifically noted in the one-paragraph analysis were assessments of normal strength during two office visits and the absence of records of manipulative limitations. *Id.* He

---

[4] The ALJ's analysis applies with equal force to Mr. Perkins's identical opinion.

16

did not explain how he determined that Russell could perform light work or why he had certain postural and reaching limitations. In fact, he did not even discuss the specific findings made by the DDS physicians. The ALJ's conclusory adoption of the DDS physicians' restrictions falls short of the required "narrative discussion describing how the evidence supports each conclusion" with citation to specific medical facts and nonmedical evidence. *See Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting SSR 96-8p).

Furthermore, the DDS physicians completed their review of the record without considering the February 2012 MRI, which depicted the most significant findings of spinal degeneration. *See* R. 90–94. This MRI showed that Russell had a moderate size broad-based central disc herniation at the C6-C7 level with slight cord compression and a mild diffuse disc bulge C5-C6. R. 703–04. Around the time of this MRI, Russell complained of increased pain and Mr. Perkins noted a worsening of Russell's degenerative disc disease in the cervical spine. Despite the MRI and Mr. Perkins's findings, the ALJ determined that "[e]vidence which has been received into the record after the reconsideration determination does not provide any new or material information that would alter any findings about the [Russell's RFC]." R. 21. This statement appears to be in tension with the regulations: Compression of the spinal cord is a critical element for a claimant to meet a listed impairment and trigger a presumption of disability. 20 C.F.R. pt. 404, subpt. P, app. 1, § 1.04. The ALJ's description of this evidence as not "material" may prove sound, but it is an assessment of objective medical evidence that no physician has endorsed. This questionable characterization further undercuts the adequacy of the ALJ's explanation of his adoption of the DDS physicians' opinions and his RFC determination. Accordingly, I find that the ALJ's decision is not supported by substantial evidence.

17

## V. Conclusion

The Court must uphold the Commissioner's decision if it is supported by substantial evidence. In this case, however, the ALJ provided an inadequate explanation of why he adopted the DDS physicians' opinions and how he determined Russell's RFC. For these reasons, I cannot find that substantial evidence supports the Commissioner's decision. Accordingly, I will **GRANT** Russell's motion for summary judgment, ECF No. 16, **DENY** the Commissioner's motion for summary judgment, ECF No. 18, **REVERSE** the Commissioner's final decision, and **REMAND** this case for further proceedings under the fourth sentence of 42 U.S.C. § 405(g). A separate order will enter.

ENTER: July 22, 2015

Joel C. Hoppe
United States Magistrate Judge

18

Case 5:14-cv-00045-JCH   Document 23   Filed 07/22/15   Page 18 of 18   Pageid#: 891